*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* VERNON EUGENE PROCTOR, M.D.

BUREAU OF PROFESSIONAL LICENSING,

UNPUBLISHED
November 4, 2021

Petitioner-Appellee,

v

No. 353886
Board of Medicine
LC No. 18-017892

VERNON EUGENE PROCTOR, M.D.,

Respondent-Appellant.

Before: MARKEY, P.J., and BECKERING and BOONSTRA, JJ.

PER CURIAM.

Respondent, Vernon Eugene Proctor, M.D., appeals by right the order issued by petitioner, the Bureau of Professional Licensing, Board of Medicine Disciplinary Subcommittee, which suspended respondent's license to practice medicine for two years. On appeal, respondent argues that the Michigan Medical Marihuana Act provided protection from negative licensing actions, that the administrative law judge erred by qualifying the physician witness as an expert, and that the administrative law judge's findings were not supported by competent, material, and substantial evidence. We disagree.

## I. FACTUAL BACKGROUND

Respondent issued 21,708 medical marijuana certifications between June 9, 2015 and June 8, 2016. The former manager of petitioner's Michigan Medical Marijuana section testified that her office had the responsibility to verify medical marijuana certifications for medical marijuana applications, but when her office called respondent's office to verify the certifications using the patients' names and dates of birth, respondent was unable to provide her with the information. Respondent testified that his staff organized his files by clinic and date rather than patient name and birthday. Additionally, the grandparent of one of respondent's patients, ML, filed a complaint alleging that respondent had not examined ML, or determined whether he had chronic pain or any medical history for which medical marijuana would be appropriate.

On September 5, 2018, petitioner requested an administrative hearing concerning the allegations involving respondent. Petitioner sought to determine whether respondent had violated

-1-

the Public Health Code, specifically MCL 333.16221(a) (negligence), (b)(*i*) (incompetence), (b)(*vi*) (lack of good moral character), (e)(*iii*) (promotion of unnecessary treatment for personal gain), and (h) (violating promulgated rules), and MCL 333.16213(1) (recordkeeping).

At the hearing, Dr. Phillip Rodgers testified as an expert and opined that respondent violated the standard of care applicable to ML. According to Dr. Rodgers, the standard of care for prescribing marijuana was the same as any other controlled substance. That standard required establishing a relationship with the patient, understanding the patient's needs by obtaining a detailed medical history, conducting a physical examination, providing a diagnosis and medical decision-making, and maintaining records of patient care that included follow-up visits. Dr. Rodgers described the ways in which respondent's treatment of ML violated these standards. Based on his review of ML's medical records, Dr. Rodgers observed that respondent had not documented a physical examination or medical decision-making, that ML's file had no diagnosis or treatment plan, and no plan for continuity of care. Additionally, respondent lacked records. He also testified that it would be impossible for respondent to meet the standards of care for 21,708 patients a year. Dr. Rodgers calculated that respondent saw 60 patients a day on average, assuming he worked seven days a week. He opined that it was not possible to see 60 patients a day and meet a minimal standard of care. There was an amount of time involved in providing services that met a minimum standard of care, and it was "just not possible to see that many patients in a day." Respondent treated an additional 124 complex substance abuse patients, which made it less likely that respondent was meeting minimum standards of care based on sheer patient volume because uncommon and complex patients required more time.

In his written response to questions, respondent indicated that ML did not seek to be diagnosed for a medical complaint. ML only sought a medical marijuana certification. Respondent testified that he had exercised medical judgment to determine that medical marijuana would alleviate ML's symptoms. He did so on the basis that ML stated he had been using marijuana and it worked well for him. Respondent also considered that, because marijuana worked for ML and ML had a family history of substance abuse disorders, marijuana would keep ML from using other illegal substances. Respondent stated that his treatment plan for ML was to authorize his certification and discuss with ML: the ways to ingest medical marijuana; the risks and benefits of medical marijuana; the requirements for the medical uses of marijuana; the risks of adapting a tolerance to medical marijuana; ML's responsibility to determine effective quantities; that ML should follow up with his primary care physician; and ML's "opportunity" to contact his office to follow up.

Further, respondent did not agree that he recommended 21,708 certifications from June 2015 to June 2016. He believed it was more than 1,000, but he could not say whether it was more than 5,000. He also testified, "I go to 5 clinics a day, and there's 20 to 50 patients there and I work 12 to 14 hours a day 7 days a week." Respondent agreed that 20 times five was 100, and after he testified that he could not multiply 100 by 365 in his head, his counsel conceded that it was about 36,500. He disagreed that he saw that many patients a year. There were ranges of patients at a clinic, which might be 10 to 30 patients.

The administrative law judge found that respondent was negligent for failing to meet ML in person, failing to diagnose his conditions, and failing to plan for his continuity of care. The judge found respondent's explanation of how he was able to issue 21,708 certificates in a year

"unconvincing." He found that respondent was incompetent for failing to conform to the standard of care and consistently signing certificates for an extended period of time. The judge found that respondent lacked good moral character for issuing a high volume of certificates, which demonstrated a lack of openness, fairness, and honesty to his patients. The judge determined that the exceptions in the Michigan Medical Marihuana Act (MMMA), MCL 333.26421 *et seq*., did not apply.[1] Finally, the judge determined that respondent had failed to maintain medical records. The Board of Medicine disciplinary subcommittee adopted the administrative law judge's proposed decision, and ordered respondent's medical license suspended for two years. He now appeals.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

When reviewing an agency's decision, a court's review is limited to determining whether the agency's action was authorized by law, and whether the agency's findings of fact "are supported by competent, material, and substantial evidence on the whole record." Const 1963, art 6, § 28. Substantial evidence is "evidence that a reasoning mind would accept as sufficient to support a conclusion." *Dignan v Mich Pub Sch Employees Retirement Bd*, 253 Mich App 571, 576; 659 NW2d 629 (2002). This is more than a scintilla but less than a preponderance of the evidence. *VanZandt v State Employees' Retirement Sys*, 266 Mich App 579, 584; 701 NW2d 214 (2005). This Court reviews de novo questions of law surrounding an agency's decision. *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 100-102; 754 NW2d 259 (2008).

This Court reviews de novo the preliminary questions of law surrounding the admission of evidence, such as whether a rule of evidence bars admitting it. *Mich Dep't of Transp v Haggerty Corridor Partners Ltd Partnership*, 473 Mich 124, 134; 700 NW2d 380 (2005). This Court reviews for an abuse of discretion preserved challenges to evidentiary rulings. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). A court abuses its discretion when its decision falls outside the range of principled outcomes. *Id*.

### B. MMMA IMMUNITY

Respondent argues that he was not subject to licensing consequences pursuant to the MMMA. We disagree.

The MMMA provides in pertinent part:

> A physician shall not be subject to . . . disciplinary action by the Michigan board of medicine, the Michigan board of osteopathic medicine and surgery, or any other business or occupational or professional licensing board or bureau, *solely for providing written certifications*, in the course of a bona fide physician-patient relationship and *after the physician has completed a full assessment of the qualifying patient's medical history*, or for otherwise stating that, in the physician's

---

[1] We will use the more common spelling, "marijuana," throughout this opinion.

-3-

professional opinion, a patient is likely to receive therapeutic or palliative benefit from the medical use of marihuana to treat or alleviate the patient's serious or debilitating medical condition or symptoms associated with the serious or debilitating medical condition, *provided that nothing shall prevent a professional licensing board from sanctioning a physician for failing to properly evaluate a patient's medical condition or otherwise violating the standard of care for evaluating medical conditions*. [MCL 333.26424(g) (emphasis added).]

First, MCL 333.26424(g) contains an explicit exception for violations of the standard of care. Respondent was not subject to disciplinary action solely for providing written certifications for medical marijuana. The administrative law judge concluded that respondent had violated MCL 333.16221(a) (negligence) because respondent had not met the applicable standards of care.

Second, respondent did not conduct a full assessment of ML. The MMMA describes a full assessment for the purposes of a written certification as "a full assessment of the patient's medical history and current medical condition, including a relevant, *in-person*, medical evaluation." MCL 333.26423(q)(2) (emphasis added).[2] Both respondent and ML testified that they met through a video system. Therefore, respondent did not conduct a "full assessment of the qualifying patient's medical history" for the purposes of immunity under MCL 333.23424(g).

## C. EXPERT QUALIFICATION

Respondent next argues that Dr. Rodgers was not properly qualified as an expert because he relied on medical standards he previously disavowed and his methods were unreliable because literature did not support them. This argument lacks merit because Dr. Rodgers testified that the standard of care was determined by practice, not publications, but he nevertheless relied on two publications to support his testimony regarding the standard of care.

An expert witness may offer an opinion only if he or she has specialized knowledge that will assist the trier of fact to understand the evidence. *Edry*, 486 Mich at 639. MRE 702 provides the mechanism by which experts may offer testimony:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 702 obligates the trial court to "ensure that any expert testimony admitted at trial is reliable." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 780; 685 NW2d 391 (2004). The support of peer-reviewed, published literature is not always necessary for admissibility. *Edry*, 486

_____

[2] MCL 333.26423 was recently amended, effective October 11, 2021. 2021 PA 62. This provision is now contained in MCL 333.26423(r)(2).

Mich at 641. However, a lack of supporting literature may render an expert's opinion unreliable. *Id*. at 640.

In this case, Dr. Rodgers testified that he was board-certified in family medicine with a certificate of qualification in hospice and palliative medicine. He created a report as part of his review of respondent's case. His report relied in part on the Michigan Boards of Medicine and Osteopathy standards, and a statement issued by the American Society of Addiction Medicine. The American Board of Addiction Medicine components for a full evaluation "map[ped] at a high level very closely with" his opinion about the standard of care. The Michigan Boards standards were also very similar. However, the standards of care were "not laid out in a specific piece of paper," but were the sum of prevailing practices. Additionally, although Dr. Rodgers did not recall testifying in April 2016 that he did not rely on the Michigan Boards standard to determine the standard of care, after reviewing his testimony, he testified that it was consistent with the Michigan Boards standard of care.

We conclude that the administrative law judge's decision to certify Dr. Rodgers as an expert did not fall outside the range of principled outcomes. This case is not similar to *Edry*, 486 Mich at 641-642, in which the doctor's opinion testimony was contradicted by the published literature, and Internet materials produced by the party who had hired the doctor as an expert did not directly support the doctor's testimony. Dr. Rodgers's opinion was based on prevailing practices that were consistent with literature published by reputable sources.

## D. NEGLIGENCE AND INCOMPETENCE

Additionally, respondent asserts that petitioner erred by accepting the administrative law judge's finding that he was negligent and incompetent. We disagree.

Subject to exceptions that do not apply in this case, the Board of Medicine Disciplinary Subcommittee shall investigate allegations of

> (a) . . . a violation of general duty, consisting of negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results, or any conduct, practice, or condition that impairs, or may impair, the ability to safely and skillfully engage in the practice of the health profession.
>
> (b) Personal disqualifications, consisting of 1 or more of the following:
>
> (*i*) Incompetence. . . .  [MCL 333.16221.]

After finding a violation of either of these subsections, the subcommittee may sanction a respondent with probation, limitation, denial, suspension, revocation, permanent revocation, restitution, or a fine. MCL 333.16226(1).

First, respondent argues that medical malpractice standards regarding specialist testimony should be applied to expert witnesses under licensing review in order to comply with due-process requirements. We reject this argument.

The Michigan and United States Constitutions provide in part that no person shall be deprived of property without due process of law. US Const, Am XIV; Const 1963, art 1, § 17. Once a license is granted, it becomes a protected property interest that may not be revoked without due process of law. *Bio Tech, Inc v Dep't of Natural Resources*, 235 Mich App 77, 81; 596 NW2d 633 (1999). The essential purpose of procedural due process is to ensure fundamental fairness, which requires notice of the proceeding and an opportunity to be heard. *Al-Maliki v LaGrant*, 286 Mich App 483, 485; 781 NW2d 853 (2009).

Respondent's argument is based on a statutory standard, not a due-process standard. In medical malpractice cases, a plaintiff must prove that the respondent, if a specialist, failed to provide a standard of care consistent with that specialty. MCL 600.2912a(1)(b). This statutory requirement is not related to a respondent's notice of disciplinary proceedings or a respondent's opportunity to be heard. There is no basis from which to conclude that the result in respondent's case was fundamentally unfair.

Second, respondent argues that the standards applicable to an independent medical evaluation should be applied to his case. We conclude that respondent has abandoned this argument by failing to support it.

"A party may not merely announce a position and leave this Court to discover and rationalize the basis for the claim." *Caldwell v Chapman*, 240 Mich App 124, 132; 610 NW2d 264 (2000). In this case, respondent asserts that the standards for independent medical examinations could apply in licensing cases, cites a case containing that standard, and defines the practice of medicine in a footnote. Respondent has not explained why an independent medical examination standard should be applied in a licensing case. Respondent does not even positively assert that such a standard *should* be applied; he asserts that a standard "could" be applied. We conclude that respondent has abandoned this argument.[3]

Third, respondent argues that petitioner did not establish that respondent actually breached the standard of care related to ML. We conclude that competent, material, and substantial evidence supported the administrative law judge's findings.

This Court gives deference to an agency's findings of fact, "particularly with regard to witness credibility and evidentiary questions." *VanZandt*, 266 Mich App at 588. Additionally, circumstantial evidence and inferences from the evidence may support findings of fact. See *Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012).

Dr. Rodgers opined that the standard of care required establishing a relationship with the patient, understanding the patient's needs, conducting a review, and having "a face-to-face hands-on interaction" with the patient, and he opined that a physical examination was important. In this case, respondent met ML through a video system when he had not previously interacted with ML.

---

[3] Regardless, there would be no basis to adopt this standard because the purposes of independent medical evaluations and medical marijuana certifications are different. Compare *Bureau of Health Professions v Severn*, 303 Mich App 305, 309-310; 842 NW2d 561 (2013), with MCL 333.26422(a).

-6-

ML had complained of back pain and headaches. Dr. Rodgers opined that telemedicine was not sufficient because respondent could not test range of motion or conduct a neurological examination. Dr. Rodgers also opined that respondent acted below the standard of care when he failed to diagnose ML, but respondent testified that a diagnosis was not necessary. Although respondent provided explanations for why he did not think tests or a diagnosis were necessary or appropriate, it was for the administrative law judge to determine his credibility and the weight of the evidence. Finally, Dr. Rodgers opined that continuity of care was part of the standard of care, and ML's medical records did not include a plan for continuity of care because it placed the onus on the patient to follow up.

We conclude that competent, material, and substantial evidence supported the administrative law judge's finding that respondent violated the standard of care by failing to meet with ML, diagnose his medical conditions, or provide for continuity of care.

We also reject respondent's argument that he could not have breached his standard of care related to ML because he could not foresee causing an injury to ML when ML already used marijuana.

Generally, a plaintiff proves that a defendant breached his or her duties by establishing that the defendant's actions fell below the general standard of care to act reasonably to prevent harm to others. *Case v Consumers Power Co*, 463 Mich 1, 6-7; 615 NW2d 17 (2000). If it is not foreseeable that the defendant's conduct could pose a risk of injury to a person with whom the defendant has a relationship, then there is no duty not to engage in that conduct. *Hill v Sears, Roebuck & Co*, 492 Mich 651, 661; 822 NW2d 190 (2012).

In this case, ML testified that he told respondent that he already self-medicated with marijuana. ML and respondent both testified that ML followed up with him in phone conversations. However, Dr. Rodgers testified that it was necessary for a physician to document the history, examination, and medical decision-making for purposes of community and patient safety. He explained that documentation was important to inform service the next time the physician saw the patient, or if the patient was seen by another provider. However, respondent did not document his follow-up care or ML's record of evaluations, services, tests, and prior history. Respondent admitted that he did not document at least one phone conversation with ML. Because Dr. Rodgers testified that doing so was necessary for ML's safety, respondent's argument lacks merit.

Next, respondent argues that, because negligence depends on a standard of care at a given time and the administrative law judge did not state a time frame during which negligence occurred, his findings were insufficient. The record does not support this argument.

The party seeking reversal must provide the court with a record that verifies the basis of his or her argument. *Petraszewsky v Keeth*, 201 Mich App 535, 540; 506 NW2d 890 (1993). The administrative law judge specifically found that respondent met with ML on January 3, 2017, using telemedicine, and that ML's medical records were subject to a subpoena on May 19, 2017. The proposal for decision clearly indicates the time frame during which the negligence occurred.

Finally, respondent argues that he was not incompetent for the same reasons that he was not negligent. Because respondent's negligence arguments fail, his incompetence argument also fails. See MCL 333.16226(1).

## E. GOOD MORAL CHARACTER

Respondent argues that the administrative law judge erred by finding that he lacked good moral character because the judge used the wrong statutory definition, and that competent, material, and substantial evidence did not support the judge's findings because respondent's signature had been forged. We reject these arguments.

A disciplinary subcommittee may investigate allegations of

[p]ersonal disqualifications, consisting of 1 or more of the following:

* * *

(*vi*) Lack of good moral character. . . . [MCL 333.16221(b).]

First, respondent's argument that the administrative law judge relied on the wrong definition of "good moral character" is baseless. MCL 333.16104(6) defines good moral character as "good moral character as defined in, and determined under, . . . MCL 338.41 to 338.47." MCL 338.41 in turn defines "good moral character" as "the propensity on the part of an individual to serve the public in the licensed area in a fair, honest, and open manner." The judge explicitly used the definition of good moral character found in MCL 338.41.

Second, respondent argues that the administrative law judge's finding that he lacked good moral character was insufficient because he presented evidence that some of his certifications had been forged and that he did not concede that he issued a high number of certifications. These findings were credibility determinations that this Court will not overturn.

This Court gives deference to an agency's findings of fact, "particularly with regard to witness credibility and evidentiary questions." *VanZandt*, 266 Mich App at 588. In this case, in 2012, respondent wrote the Department of Licensing and Regulatory Affairs to indicate that his signature had been forged on certifications. The program manager testified that the Michigan Medical Marijuana Program attributed 21,708 certifications to respondent, but respondent did not agree that he recommended 21,708 certifications from June 2015 to June 2016. Dr. Rodgers testified that it was not possible to see 60 patients a day and meet minimum standards of care, but respondent testified that he worked 12 to 14 hours a day, seven days a week, went to five clinics a day, and saw between 10 and 50 patients at each clinic. The administrative law judge explicitly found respondent's explanations of how he did so "unconvincing."

Competent, material, and substantial evidence supported his finding that respondent lacked good moral character for violating the standard of care regarding so many patients. Whether respondent actually certified 21,708 patients for the use of medical marijuana or whether his signature was forged were credibility and weight determinations that we will not overturn.

## F. RECORDKEEPING

Respondent argues that competent, material, and substantial evidence did not support the administrative law judge's finding that he failed to properly maintain medical records because petitioner only presented evidence that he had not been able to verify his certifications on the basis of the information that petitioner provided to him. We disagree.

The disciplinary subcommittee may investigate an allegation that the licensee violated "the medical records access act, . . . MCL 333.26261 to 333.26271." MCL 333.16221(s). A licensed individual must keep records for each patient to whom the licensed individual has provided medical services, and the records "shall be maintained in such a manner as to protect their integrity, to ensure their confidentiality and proper use, and to ensure their accessibility and availability to each patient or his or her authorized representative as required by law." MCL 333.16213(1).

Again, circumstantial evidence and inferences from the evidence may support findings of fact. See *Kalaj*, 295 Mich App at 429. In this case, the administrative law judge found that the fact that petitioner was unable to obtain documentation was sufficient to establish that respondent did not comply with statutory recordkeeping requirements. The Michigan Medical Marijuana Program manager testified that people within her office called respondent's office to try to verify his certification on an application. Respondent's staff stated that they could not confirm certification unless the manager provided a date on which an application was signed.

Although respondent argues that it was not his duty to verify certification and that his records were accessible by information that petitioner chose not to provide, his arguments miss the point. Respondent's inability to provide medical records to petitioner provided circumstantial evidence that the patients' medical records were not reasonably accessible to his patients. If respondent could not provide medical records to petitioner on the basis of the patient's name and date of birth, the patients would not have been able to obtain their own medical records with the same information. We conclude that the administrative law judge's finding was supported by competent, material, and substantial evidence.

Affirmed.


/s/ Jane E. Markey
/s/ Jane M. Beckering
/s/ Mark T. Boonstra

-9-